# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRAMELL V. TAYLOR,<br>Petitioner,<br>v.<br>GEORGE STRATTON, WARDEN,<br>Respondents.<br>_______________________________/ | CV F 04-6304 LJO SMS HC<br>FINDINGS AND RECOMMENDATION REGARDING AMENDED PETITION FOR WRIT OF HABEAS CORPUS<br>[Doc. 16] |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

<u>BACKGROUND</u>

Following a jury trial in the Kern County Superior Court, Petitioner was convicted of premeditated murder and conspiracy to commit robbery. In addition, Petitioner pled guilty to assault with a firearm. He was sentenced to life in state prison without the possibility of parole.

Petitioner filed a timely notice of appeal. On October 14, 2003, the California Court of Appeal, Fifth Appellate District affirmed Petitioner's conviction and sentence. (Lodged Doc. No. 4.)

Petitioner filed a petition for review in the California Supreme Court, which was denied on January 22, 2004. (Lodged Doc. Nos. 5-6.)

Petitioner did not file any other collateral or post-conviction petitions in the state courts.

Respondent filed an answer to the petition on October 6, 2005. (Court Doc. 20.)

Petitioner did not file a traverse. On September 12, 2007, the Court directed Respondent to submit supplement briefing in light of the Ninth Circuit's opinion in Kesser v. Cambra, 465 F.3d 351, 360 (9th Cir. 2006). (Court Doc. 26.) Respondent submitted supplemental briefing on October 29, 2007, and Petitioner did not file a response. (Court Doc. 29.)

## STATEMENT OF FACTS[1]

Murder victim Darryl McCoy, Jr. (DJ)[2] "hung out" with defendant Richardson and knew [Petitioner]. McCoy's mother, Shawna Gooden, used crack cocaine. From October to December of 2000 she sometimes purchased her drugs from Kendall McDaniel (Pookie) at the Desert Star Motel. Gooden also had a relationship with Calvin Makes (Aces), a friend of McDaniel.

On the evening of December 5, 2000, Aaron Gooden (McCoy's uncle and Shawna's brother) was staying with Shawna in her home. McCoy, [Petitioner] and Richardson arrived at Shawna's home at approximately 10 or 11 p.m. on the evening of December 5, 2000. On this night, Shawna heard McCoy talk with Richardson about robbing McDaniel in his room at the Desert Star. Richardson suggested that McCoy ask Shawna if McDaniel and his friends had guns and/or money. Shawna told McCoy not to ask her anything.

McCoy, [Petitioner] and Richardson conversed that evening with Aaron. They asked him what was happening on "U Block (Union Street) and inquired if there was any "money rolling through there." Aaron told the three "nobody got it going on down there." [Petitioner] disagreed with Aaron's assessment of the situation and insisted that McDaniel and others had a lot of money. [Petitioner] continued to encourage the group to go to the Desert Star to rob McDaniel and others. Aaron insisted that the occupants of the motel did not have any money. McCoy, Richardson and [Petitioner] agreed to a plan to go to the motel and rob McDaniel and others. Aaron testified that Richardson always carried a gun with him and that [Petitioner] was carrying a small gun with a clip the night of the murder.[3]

McCoy, [Petitioner] and Richardson left in a dark-colored Ford Blazer. [Petitioner] was driving.

In December of 2000, McDaniel had been living in room 4 of the Desert Star motel for two or three months. His sister Crystal lived in room 3 with their mother, Darlene Lewis. Crystal's boyfriend was Brian Calhoun (Rifle). Bobby Smith (G Bob) lived in room 12.

On the evening of December 5, 2000, McDaniel, Tyrone James (Rone), and Shavon Smith (V) were in room 4 drinking, smoking marijuana, and watching television. Calhoun was in and out of room 4 that evening.

---

[1] The Court finds the Court of Appeal correctly summarized the facts in its October 14, 2003, opinion. (Lodged Doc. No. 4.) Thus, the Court adopts the factual recitations set forth by the California Court of Appeal, Fifth Appellate District.

[2] Places in the record refer to many persons involved in this case by nicknames. We set forth nicknames in parenthesis, but make further references to last names. Where persons have the same last name, first names will be used; in two of those instances nicknames will be used rather than first names (Shavon Smith (V) and Bobby Smith (G Bob)). No disrespect is meant.

[3] When initially questioned, Aaron denied knowing anything. At the preliminary hearing he testified that he did not see any weapons. Aaron was in the witness protection program prior to and at the time of trial.

2

1   G Bob saw McCoy outside of G Bob's room before 1 a.m. on December 6, 2000. He was with two other individuals that G Bob did not know. McCoy was wearing a light-colored sweatshirt. The three individuals came into his room. G Bob asked McCoy if he would sell him some crack cocaine. McCoy said he was not there to sell crack. G Bob asked McCoy if he wanted to pay for a prostitute. McCoy replied no. The group was in his room for three to five minutes and then G Bob asked them to leave. G Bob left also.

G Bob testified that he had seen a gun lying on a table in room 4 on more than one occasion. He was in room 4 before the shooting and he saw the gun in the room on a table. At trial, G Bob said he did not see [Petitioner], Richardson, or McCoy with a gun. When G Bob was interviewed soon after the shooting, he told Detective Adair that one of the three mean pulled out a gun as the men walked toward room 4. G Bob identified Richardson as the individual with the gun. At trial, he testified that he never saw anyone pull out a gun.

At the time when McCoy was visiting with G Bob, Calvin Makes (Ace) arrived at the Desert Start Motel to pick up McDaniel. He noticed three or four men wearing dark clothing by room 12. He got "bad vibes" from them and thought they looked like they were getting "geared up" for something. Makes knocked on the door of room 4. McDaniel answered the door, and Makes told him to grab his stuff so they could get out of there because there were men nearby who looked suspicious. Makes headed towards his car to wait for McDaniel. McDaniel shut the door and stayed in the room to gather up some of his things. Someone called the room and told McDaniel that some suspicious men in the parking lot were going to do something.

McDaniel opened the door and saw "the silver guns" and then he saw "gun flashes." McDaniel tried to close the door. He ran to the bathroom. He heard 12 or 13 more shots and then left through the bathroom window. McDaniel told officers that the person who shot him wore a ski mask or a hood.

V testified that 10 minutes after someone came to their door and warned them that there were suspicious people outside, someone came in the room shooting. V was on the bed half asleep when the shooting started; he fell to the side of the bed. One person came into the room shooting and another person started shooting from outside of the room. After a few minutes the shooting stopped and V went out the bathroom window.

When interviewed by Detective Adair, V stated that after they had been warned that something was going to occur he looked out of the room. He saw G Bob and three others approach the room. G Bob continued walking away from the room but the other three stopped. Two of the males were wearing dark clothing and a third was wearing light-colored clothing. He said that one [sic] in dark clothing entered the room shooting and another in dark clothing stayed in the area of the open door and was shooting into the room. He did not see the person in the light-colored clothing in the room or shooting.

James testified that he was asleep before the shooting. He dropped to the floor and stayed there until the shooting stopped. He then left out the bathroom window. Because he was on the floor he did not see anything.

McDaniel, V, and James all testified that they did not have a gun in the room and they were not selling drugs from the room. They denied being members of the Country Boy Crips.

Calhoun testified that he was in room 3 with McDaniel's sister when he heard gunshots. He did not look out the window and did not see anyone. He got down on the floor beside the bed and eventually jumped out the bathroom window. When interviewed after the shooting, Calhoun said he heard gunfire and looked out the window. He said he saw someone outside his window in room 3 wearing a light-colored sweatshirt, leaning forward and twisting and shooting a handgun into room 4. It looked like this person got shot and fell to the ground.

3

Warren Murrow was living at the Desert Star motel in room 15. He heard shots in the early morning hours of December 6, 2000. He called 911 but did not look out his window. When he did look out his window, he saw two people picking up a body and putting it into a dark-colored sports utility vehicle.

Police officers arrived at the Desert Star motel. McDaniel had been shot. He was transported to the hospital. McDaniel had a gunshot wound to his upper abdomen. The entry wound was underneath the ribs; the bullet was lodged in the back of his body, just behind his armpit. McDaniel also had a penetrating gunshot wound in his right upper arm and left forearm. Bullets were not recovered from these wounds.

Police officer Bobby Ray Woolard arrived at the Desert Star Motel. He secured room 4 and then waited outside. He heard a noise inside the room. He reentered the room and found V and James had entered the room from the bathroom window. They were placed into handcuffs and seated in patrol cars.

The police radios were on in the car. Information came over the radio indicating that [Petitioner] may have been involved in the incident. V said, "[Petitioner] definitely shot Pookie." Officer Woolard saw what looked like drugs in front of room 4.

On December 6, 2000, Raynisha Fite, the mother of [Petitioner's] child, was at the home of her mother, Latonia Weston. Her sister Kandis Naffs was at the home also. Naffs heard a car coming quickly up the street. She heard the car brake and the car doors open. The front door to the house opened and [Petitioner] ran inside. He said his friend had been shot. Weston called 911. Naffs called an ambulance and went outside, as did Fite and Weston. [Petitioner] and Richardson took McCoy out of the Blazer and put him on the grass. Naffs took McCoy's shirt off and tried to stop the bleeding. [Petitioner] was standing over Naffs; shortly thereafter [Petitioner] departed.

Police arrived at Weston's home. An officer asked Richardson for his driver's license. He complied. The officer inquired who had been driving the Blazer. Richardson said Tramell. The officer asked Richardson for the room number of where this incident took place. Richardson commented they were just visiting friends. The officer told Richardson he knew this incident happened at Desert Star and asked him for the number of the room where the incident occurred. Richardson admitted the incident happened near room 4. The officer went inside looking for [Petitioner] but could not find him. When the officer returned outside, Richardson was no longer at the scene.

McCoy was transported to the hospital. He died from a single gunshot wound through his heart. The path of the bullet was sharply downward and front to back. It was the pathologist's opinion that McCoy was crouched or in a stooped position when he was shot. McCoy would have been incapacitated in a matter of second after being shot. A bullet was retrieved from McCoy's body.

Officer Jeff Cecil seized items from the lawn on Fifth Street. Included in the items were a white tee shirt and a gray fitted sweatshirt. These items had blood on them. There were no bullets or guns in the Blazer on Fifth Street.

A bullet was retrieved from McDaniel during surgery. Numerous nine-millimeter Markahov casings were found in room 4. An expert determined that the bullet from McDaniel and the casings found scattered about in room 4 were fired from the same weapon. Two .38 caliber spent bullets were found in room 4. The bullet recovered from the deceased victim, McCoy, was either a .38-caliber or a nine-millimeter. Based on markings on the bullets and casings, the expert determined that the bullet from McCoy's body could not have been fired from the same gun that fired the bullet retrieved from McDaniel or the .38-caliber spent bullets found in room 4. At least three guns were fired during the shooting. In addition, two live .45-caliber shells were located in the parking lot, suggesting the presence of a fourth gun. Also, there were numerous holes in the walls and

windows of room 4. Because of the location of the holes, the police did not attempt to recover spent bullets from these areas.

Frank Gonzales, a police officer in the gang suppression unit, testified that Calhoun, V, and James were active members in the Country Boy Crips. McDaniel was not a full-fledged Country Boy Crip but was an affiliate. [Petitioner], Richardson, and McCoy were members of the West Side Crips. The West Side Crips and the Country Boy Crips were deadly rivals. It was his opinion that the crimes that occurred on December 6, 2000, were gang related and performed with the intent of benefitting the gang.

**Defense**

Witnesses testified regarding the whereabouts of [Petitioner] and Richardson on December 5, 2000.[4] Richardson testified on his own behalf. He claimed his group went to the motel because McCoy wanted to visit G Bob. As they were leaving, shots rang out from room 4. Richardson and [Petitioner] picked up McCoy, put him in the Blazer, and drove to Fifth Street. Richardson was so shaken up by the incident that he left after giving the police officer his identification. He claimed that he did not have a gun, nor did [Petitioner] or McCoy. A private investigator testified that it was his opinion that Richardson was not a gang member.

(Lodged Doc. No. 4, Opinion, at 2-8, footnotes in original.)

DISCUSSION

A.  Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

---

[4] Presumably this testimony was to defeat the allegation that the defendants drove through the parking lot of the Desert Star Motel the afternoon of December 5, 2000. The jury found this over act to be not true.

5

(1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.      Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction. Brecht v. Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993). In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day,

6

110 F.3d 1380, 1388 (9th Cir. 1997).

C. <u>Equal Protection Violation</u>

Petitioner contends that the trial court erred in denying his motion challenging the prosecutor's exercise of a peremptory challenge based allegedly on race.

Evaluation of allegedly discriminatory peremptory challenges to potential jurors in federal and state trials is governed by the standard established by the United States Supreme Court in <u>Batson v. Kentucky</u>, 476 U.S. 79, 89 (1986). In <u>Batson</u>, the United States Supreme Court set out a three-step process in the trial court to determine whether a peremptory challenge is race-based in violation of the Equal Protection Clause. <u>Purkett v. Elem</u>, 514 U.S. 765, 767, 115 S.Ct. 1769 (1995). First, the defendant must make a *prima facie* showing that the prosecutor has exercised a peremptory challenge on the basis of race. <u>Id</u>. That is, the defendant must demonstrate that the facts and circumstances of the case "raise an inference" that the prosecution has excluded venire members from the petit jury on account of their race. <u>Id</u>.

If a defendant makes this showing, the burden then shifts to the prosecution to provide a race-neutral explanation for its challenge. Id. At this step, "the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." <u>Hernandez v. New York</u>, 500 U.S. 352, 360, 111 S.Ct. 1859 (1991). Finally, the trial court must determine if the defendant has proven purposeful discrimination. <u>Id</u>. at 359. The Supreme Court has made clear that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from the opponent of the strike." <u>Purkett v. Elem</u>, 514 U.S. at 768; <u>Rice v. Collins</u>, 546 U.S. 333, 126 S.Ct. 969, 974 (2006).

"When there is reason to believe that there is a racial motivation for the challenge, neither the trial courts nor we are bound to accept at face value a list of neutral reasons that are either unsupported in the record or refuted by it." <u>Johnson v. Vasquez</u>, 3 F.3d 1327, 1331 (9th Cir. 1993). The court must consider the record as a whole and each explanation in order to determine whether an invidious discriminatory purpose may be inferred from the totality of the relevant facts of the case. <u>Kesser v. Cambra</u>, 465 F.3d 351, 360 (9th Cir. 2006) (citing <u>Hernandez</u>, 500

U.S. at 363.)

There is no dispute that the only issue in this case is the trial court's analysis under step three of the <u>Batson</u> challenge. The California Court of Appeal did not engage in comparative juror analysis at the time of Petitioner's appeal because California caselaw prohibited courts from applying comparative juror analysis. See <u>People v. Johnson</u>, 47 Cal.3d 1194, 1220-23 (1986); People v. Turner, 8 Cal.4th 137, 169 (1994). However, subsequent federal decisions are to the contrary. For the following reasons, under current Circuit authority in Kesser v. Cambra, 465 F.3d 351 (which applied the Supreme Court's holding in <u>Miller-El v. Dretke</u>, 545 U.S. 231, 267 (2005)), this Court must conclude that the state courts' failure to conduct such analysis was contrary to clearly established federal law.

In this case, the prosecutor exercised a peremptory challenge on juror no. 210160852 (hereinafter Ms. 52), who identified herself as "half black and half white." (Aug. RT 261.) When seated on the prospective jury panel, Ms. 52 stated that she was married and had three young children. She worked at a child care center. She lived in South Bakersfield, and her husband worked for a radio station. When questioned further by the District Attorney, she indicated that her husband was also a barber. In response to the question by Petitioner's counsel, she stated that her husband's barber shop was located in "South Bakersfield." He then asked: "Do any of you know anybody or come in contact with anybody who's in a gang?" None of the jurors responded to this question.

Counsel for a co-defendant, asked the jurors if there was anything the prospective jurors would like to bring to the court's attention that had not previously been raised. Ms. 52 stated that although a prior juror had indicated that there were no Black prospective jurors in the courtroom, she was half Black. (Aug. RT 261.)

The prosecutor exercised a peremptory challenge and excused Ms. 52, and defense counsel made a motion under <u>Batson-Wheeler</u>. (RT 281, 292.) The court heard argument on the motion outside of the presence of the jury. (RT 281-282.) The court found that the defense had "stated a prima facie basis for making the challenge. . . ." (RT 285.) The court then directed the prosecutor to state the reasons for the challenge. (RT 286.)

1    The prosecutor explained that his challenge was not based on race and, indeed, it appears
2  that he did not realize the juror was of African-American descent until she actually identified
3  herself as being half white and half black. (Aug. RT 286.)  The prosecutor explained that the
4  challenge was based on her apparent young age, and he considered her to be either naive or
5  deceptive in her lack of response in acknowledging that she had ever had any contact with gang
6  members in South Bakersfield. (Aug. RT 287, 289-290.)  The court inquired as to the specific
7  concern regarding her age. (RT 287.)  The prosecutor responded that she appeared to be very
8  young, despite having three children. (Id.)  He estimated her age to be between 19 to 20 years of
9  age. (Id.)  The prosecutor then expressed his concern that although she was a residence of South
10  Bakersfield and her husband's barber was located in South Bakersfield, she declined to say
11  whether she had every had any contact with gang members.  The prosecutor construed this as
12  being a statement of naivete or somewhat deceptive. (Id.)

13    In response, defense counsel compared Ms. 52 with another juror [No. 210080340]
14  arguing that both jurors were the same in terms of residence and lack of alleged contact with
15  gangs, but the prosecutor only struck Ms. 52. (Aug. RT 289.)

16    The court denied the motion stating:

> The Court has some concern about the exercise of the challenge, but in effect, on the question of whether or not Ms. (210160852) was fully representing her knowledge or her understanding of anyone who might be a gang member or who she might know as a gang member or know anything about gang conduct, the basis, as I understand it, Mr. Hamilton [prosecutor], you think she is being somewhat naive in that regard or less than fully representative - - fully telling us what her knowledge is in that regard.
>
> ....................................................................................................................
>
> Insofar as the challenge, Mr. Hamilton [prosecutor] has  given his reasons. Those reasons are reasons that reflect on the decision he made and that is that she was relative youth.  He undertook her representations to be less than forthright or naive.  Naivete on the part of a juror, of course, would be something that anyone picking a jury would want to know about or would want to understand whether that was the case.  Combination of age and naivete, of course, can, can [sic] be something that would be a proper consideration for an attorney in picking a jury.
> If she is, in fact, naive, of course, the age might have something to do with it.  If, on the other hand, she was not representing fully any association or knowledge she might have of gangs, of course, can be of great concern if, in fact, she has greater knowledge or understanding of that issue.
> I do think the naivete reason is a legitimate basis for an excuse.  And so the Court will deny the Wheeler challenge as to the challenge of Ms. (210160852).

1  (RT 291-291.)

2  In denying Petitioner's claim on direct appeal, the Court of Appeal held, in relevant part,
3  as follows:

> First, [defendants] contend the record does not firmly establish the age of the challenged juror because she was not asked nor did she tell her age. Defendants argue that the prosecutor's age analysis is undercut by the fact that the prospective juror had three children who were old enough for her to work outside the home. The prosecutor stated that he thought the prospective juror appeared to be 19 or 20 years old. It is certainly possible for a 20-year-old to have three young children. The trial court and the parties were in the best position to judge the prospective juror's age. Defendants did not dispute the prosecutor's age estimate and the trial court, after probing the issue, accepted the prosecutor's remark. On this record we must assume the prosecutor's age assessment was fairly accurate.
>
> Next, defendants argue that the prosecutor held a cynical belief that anyone who had lived in South Bakersfield would have had contact with a gang member. Again, after the prosecutor made this statement it went unchallenged and appeared to be accepted as true by the court and by the defendants. Defendants were given an opportunity to challenge this assertion but they did not. On this record we must assume the prosecutor's unchallenged assertion had some factual basis.
>
> The prosecutor stated to the court that the prospective juror was "point blank" asked about the subject of gangs. When questioned by the court, the prosecutor was unable to recall who asked the question. Defendant argues that the prosecutor's assertion is not true. Counsel for [Petitioner] questioned Ms. 52. Immediately after Ms. 52 stated that her husband's barbershop was in South Bakersfield, [Petitioner's] counsel asked, "Do any of you know anybody or come in contact with anybody who's in a gang?" There was no response. While [Petitioner's] counsel asked a "group" question, it occurred as the first question directly after he individually questioned Ms. 52. It was clearly directed at the six most recent prospective jurors who had been seated in the jury box. She was thus "point blank" asked as part of the group of six about whether they knew anyone or had contact with anyone in a gang. Additionally, we note that during questioning Ms. 52 was asked if there was anything that had come up so far in questioning that concerned her. She replied, "nothing." Clearly questioning about gangs had come up previously and was a subject included in this global questioning of Ms. 52. The prosecutor's misrecollection, if any, was thus immaterial because Ms. 52 was clearly questioned about gang members and given the opportunity to state any gang knowledge she had.
>
> The prosecutor commented that Ms. 52 said she was a long-time resident of South Bakersfield. Defendants claim that this was an erroneous statement. Defendants are correct. Ms. 52 stated she was a resident of South Bakersfield. Nothing in the record established the length of this residency. Additionally, defendants argue that the fact that Ms. 52's husband worked in South Bakersfield had no bearing on her knowledge of South Bakersfield because it was not established how long he had worked there or if Ms. 52 had any contact with his shop. While the prosecutor's representation regarding Ms. 52's length of residency was erroneous, it was established that Ms. 52 was a resident of South Bakersfield. Also, while it was not directly shown that Ms. 52 had any direct dealings with her husband's shop, his shop established a further familial connection to the area and a reasonable inference is that she had been to the shop, was familiar with the area, or at least discussed things about the shop with her husband. The erroneous assumption by the prosecutor did not substantially

> detract from his hypothesis that a person who resided and/or spent much time in South Bakersfield would have at least some minimal knowledge about gang members.

(Lodged Doc. No. 4, Opinion, at 13-15.)

In Kesser v. Cambra, 465 F.3d 351 (9th Cir. 2006),[5] the Ninth Circuit discussed at length the requirements of the court in analyzing a step-three Batson challenge:

> At this stage, "the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Purkett*, 514 U.S. at 768. Although the burden remains with the defendant to show purposeful discrimination, the third step of *Batson* primarily involves the trier of fact. After the prosecution puts forward a race-neutral reason, the court is required to evaluate "the persuasiveness of the justification." Id. To accept a prosecutor's stated nonracial reasons, the court need not agree with them. The question is not whether the stated reason represents a sound strategic judgment, but "whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Hernandez v. New York*, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion). "It is true that peremptories are often the subjects of instinct," and that "it can sometimes be hard to say what the reason is." *Miller-El*, 125 S.Ct. at 2332. "But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." *Id*. "While subjective factors may play a legitimate role in the exercise of challenges, reliance on such factors alone cannot overcome strong objective indicia of discrimination...." *Burks v. Borg*, 27 F.3d 1424, 1429 (9th Cir. 1994).
>
> The trier of fact may not turn a blind eye to purposeful discrimination obscured by race-neutral excuses. "[T]he prosecutor must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges." *Batson*, 476 U.S. at 98 n.20 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). "A Batson challenge does not call for a mere exercise in thinking up any rational basis." *Miller-El*, 125 S.Ct. at 2332. Reasons must be "related to the particular case to be tried." *Batson*, 476 U.S. at 98. "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768.
>
> The Court need not accept any proffered rationale. We have recognized that "[w]hen there is reason to believe that there is a racial motivation for the challenge, neither the trial courts nor we are bound to accept at face value a list of neutral reasons that are either unsupported in the record or refuted by it." *Johnson*, 3 F.3d at 1331. The court must evaluate the record and consider each explanation within the context of the trial as a whole because "'[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts.'" *Hernandez*, 500 U.S. at 363 (quoting *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 576 (1976)); *see also Miller-El*, 125 S.Ct. at 2324 (noting that *Batson* requires inquiry into "'the totality of the relevant facts' about a prosecutor's conduct" (quoting *Batson*, 476 U.S. at 94)); *Batson*, 476 U.S. at 93 ("In deciding if the defendant has carried his burden of persuasion, a court must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." (internal quotation marks omitted)). A court need not find

---

[5] Ninth Circuit authority is binding on the United States District Court in the Eastern District of California. See Hart v. Massanari, 266 F.3d 1155, 1172 (9th Cir. 2001) ("an opinion of our circuit is binding within our circuit").

all nonracial reasons pretextual in order to find racial discrimination. "[I]f a review of the record undermines the prosecutor's stated reasons, or many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination." *Lewis v. Lewis*, 321 F.3d 824, 830 (9th Cir. 2003); *see also United States v. Chinchilla*, 874 F.2d 695, 699 (9th Cir. 1989) ("Thus, the court is left with only two acceptable bases for the challenges. . . . Although these criteria would normally be adequately 'neutral' explanations taken at face value, the fact that two of the four proffered reasons do not hold up under judicial scrutiny militates against their sufficiency.").

Kessler, 465 F.3d at 359-360.

At the third Batson step, the trial court must determine whether there has been intentional discrimination. Hernandez, 500 U.S. at 359. "The decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." Id. at 365. "The trial court must not simply accept the proffered reasons at face value; it has a duty to 'evaluate meaningfully the persuasiveness of the prosecutor's [race]-neutral explanation[]' to discern whether it is a mere pretext for discrimination." Williams v. Rhoades, 354 F.3d 1101, 1108 (9th Cir. 2004) (citing United States v. Alanis, 335 F.3d 965, 969 (9th Cir. 2003).). "Thus, the trial court must evaluate the prosecutor's proffered reasons and credibility under 'the totality of the relevant facts,' using all the available tools including its own observations and the assistance of counsel." Mitleider v. Hall, 391 F.3d 1039, 1047 (9th Cir. 2004) (citing Lewis v. Lewis, 321 F.3d at 831.)

Here, the California Court of Appeal's, October 14, 2003, decision was issued prior to the United States Supreme Court's decision in Miller-El v. Dretke, 545 U.S. 231, dated June 13, 2005. There, the defendant was tried for capital murder. The prosecution exercised peremptory strikes against ten out of eleven prospective African-American jurors. Id. at 233. Over defendant's objection that the strikes were improperly based on race, the trial court denied the motion and he was sentenced to death for murder.[6]

---

[6] The case has a rather lengthy procedural history. While the direct appeal was pending before the state appellate court, the United States Supreme Court decided Batson, which resulted in the case being remanded to the Texas trial court for application of the law as established in Batson, i.e. whether defendant could prove that the jurors were struck based on race. The trial court denied relief finding that the prosecution's reasons were race-neutral.
  Defendant then sought habeas corpus relief in the federal district court, which was denied, and the Fifth Circuit Court of Appeals denied a request for a certificate of appealability. The Supreme Court reversed the Fifth Circuit's denial of a certificate of appealability, and remanded the case back for review on the merits. 537 U.S. 322,

In addressing the merits of the petition, the Supreme Court found that the prosecution had engaged in racial discrimination by using the peremptory challenges to excuse ten out of the eleven African-American jurors. In making its finding, the Court utilized comparative juror analysis despite having been done so by state appellate courts to determine whether the use of the strikes were motivated by race. Id. at 239-262.

In Kesser v. Cambra, 465 F.3d 351, the Ninth Circuit applied comparative analysis for the first time on appeal stating that the California Court of Appeal failed "to consider comparative evidence in the record before it [which] undeniably contradicted the prosecutor's purported motivations, [and] unreasonably accepted his nonracial motives as genuine." 465 F.3d at 357. In applying comparative analysis, the Ninth Circuit held that "comparative analysis is required even when it is not requested or attempted in state court." Id. at 361. It went on to state that

> The [Supreme] Court in *Miller-El* applied comparative juror analysis to a case originally tried in 1986, remanded for a Batson hearing in 1988, and appealed under AEDPA in 2000. The Court's holding means that the principles expounded in *Miller-El* were clearly established Supreme Court law for AEDPA purposes at least by the time of the last reasoned state court decision in *Miller-El*, handed down in 1992, before Kesser's 1993 trial.

Id. at 360.

Although the state court did not engage in comparative analysis and such was contrary to clearly established federal law, the failure to do so does not in and of itself warrant relief in this action. Rather, the United States Supreme Court has recently confirmed that "when a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law," this Court "must then resolve the claim without the deference that AEDPA otherwise requires." Panetti v. Quarterman, __ U.S. __, 127 S.Ct. 2842, 2858 (June 28, 2007). Thus, this Court simply reviews the claim *de novo* to determine whether Petitioner has established purposeful discrimination at step three of Batson. See id. Although the state appellate court did not engage in comparative analysis at the time of Petitioner's appeal, this Court is presently

---

348 (2003).
    The Fifth Circuit Court of Appeals denied the petition on the merits, and the Supreme Court granted certiorari and issued the most recent decision on June 13, 2005. 545 U.S. 231.

13

1  bound by Ninth Circuit authority to conduct such analysis.[7]

2  The process of comparative analysis involves determining whether non-challenged jurors
3  possessed any of the same characteristics upon which the prosecution challenged jurors in the
4  protected group, to assist in determining whether discrimination has been proven at the third
5  Batson step. Miller-El v. Dretke, 545 U.S. at 242-243; Kesser v. Cambra, 465 F.3d at 360;
6  United States v. You, 382 F.3d 958, 968-969 (9th Cir. 2004). Applying the comparative analysis
7  as done in Kesser to the jurors that comprised of the final jury panel in this case, does not reveal
8  that the prosecution's exercise of a peremptory strike against Ms. 52 was based on pretext. Ms.
9  52 (the challenged juror), identified herself as "half black and half white." (Aug. RT 261.) She
10 stated that she was married with three young children. (Aug. RT 244.) She had never served on
11 a jury, and lived in south Bakersfield with her husband. (Id.) Her husband owns a barber shop in
12 south Bakersfield, and also works for a local radio station. (Id., Aug. RT 257-258.) Ms. 52
13 works at a hospital providing childcare to one-year old children. (Id.) She did not know anyone
14 and had not come in contact with anyone in a gang. (Aug. RT 259.)

15 Juror No. 210062208, lived "in the southwest." His wife did not work outside of the
16 home, and he had three young children. (Aug. RT 20.) He stated that his brother had been
17 arrested for driving under the influence five years previous, and he believed his brother was
18 treated fairly. (Aug. RT 107.) He worked with African-Americans, and had no contact with
19 gangs. (Aug. RT 140, 163.)

20 Juror No. 210039715, was a married man with two grown sons. (Aug. RT 173.) He was
21 retired, had lived in Bakersfield for many years, and had previously served on more than one
22 jury. (Id.) He had no contact with gangs. (Aug. RT 199.)

23 Juror No. 210080340, was a married woman with two grown children. She worked in a
24 human resources department and lived in South Bakersfield. (Aug. RT 173.) She had previously
25 served a jury in a criminal case. (Id.) She did not have any contact with gang members. (Aug.

---

[7] Ninth Circuit authority is binding on the United States District Court in the Eastern District of California. See Hart v. Massanari, 266 F.3d 1155, 1172 (9th Cir. 2001) ("an opinion of our circuit is binding within our circuit.")

1 | RT 199.)

2 |   Juror No. 210081927, was a married woman with three older children.  (Aug. RT 209-
3 | 210, 216.)  She worked two jobs as a medical records analyst at hospitals.  (Id.)  She did not
4 | state she had contact with any gang members.

5 |   Juror No. 210110210, was a married woman with four kids (two teen-aged and two pre-
6 | teen).  (Aug. RT 210.)  She worked as a support manager and spent time working with a youth
7 | group at church.  (Id.)  She did not state she had contact with any gang members.

8 |   Juror No. 21011872, was a married woman with two grown children.  (Aug. RT 226-
9 | 227.)  She was a director for a radio company and lived in Southwest Bakersfield.  (Id.)  Despite
10 | the fact that her parents were killed in a drug-related car crash, she promised to be a fair juror.
11 | (Aug. RT 229, 232, 236.)

12 |   Juror No. 210082454, lived in southwest Bakersfield, and was a single retired woman
13 | with no children.  (Aug. RT 245.)  She was a student who had served on a jury three previous
14 | times.  (Id.)  She did not state she had contact with any gang members.

15 |   Juror No. 210053070, lived in northwest Bakersfield, and was a married mother of three
16 | children (two in highschool, one in junior high).  (Aug. RT 259-260, 267-268.)  She was a
17 | children's church direct, and her husband was a pastor.  (Id.)  She did not state she had contact
18 | with any gang members.

19 |   Juror No. 210116983, lived in Rosedale, and was a single father of a 14-year-old.  (Aug.
20 | RT 269.)  He did not state he had any contact with any gang members.

21 |   Juror No. 210042980, lived in Shafter, and was a single woman working as a secretary in
22 | a real estate office.  (Aug. RT 320-321, 330.)  She stated she dealt with property in
23 | "predominantly black areas", and had experienced no problems in working with "black tenants or
24 | people."  (Aug. RT 330.)  She did not state she had contact with any gang members.

25 |   Juror No. 210062486, was a single man with no kids living in southwest Bakersfield.
26 | (Aug. RT 321-323.)  He worked for Arthur Anderson, and hd been a witness in a criminal case.
27 | (Id.)  He did not state he had contact with any gang members.

28 |   Juror No. 200224328, lived in southwest Bakersfield, and was a married woman with

15

three adult children. (Aug. RT 321.) She had previously served on a jury, and worked as adjunct faculty at Bakersfield College. (Aug. RT 321, 323.) She did not state she had contact with any gang members.

Juror No. 210076638, was an alternate juror. She lived in northeast Bakersfield, was a retired widower and had one grown son. (Aug. RT 336-337.) She did not state she had contact with any gang members.

Juror No. 210038750, was the other alternate juror. He was a married man with a grown son. (Aug. RT 337.) He did not state he had contact with any gang members.

As previously stated, the prosecutor's first reason for excluding Ms. 52 was her age. The prosecutor believed that this added to her naivety. The prosecutor believed her to be 19 or 20 years of age. In turning to comparative analysis, the record is silent as to the remaining jurors age. However, Juror No. 210062208, had three young children, and Juror Nos. 210042980 and 210062486, stated they were single with no children, their age was not even hinted at. The remainder of the jurors indicated that they had grown children or were retired. There is no evidence that any of the jurors were as young as 19 or 20. In turning to the three identified jurors whose age was ambiguous, No. 210062208 had a brother charged with driving under the influence, and he thought he had been treated fairly. No. 210042980 worked in real estate agency, and dealt with properties involving "black people." No. 210062486 worked for Arthur Anderson, one of the big five accounting firms. Nothing in record supports an inference and it would be difficult to image that these three appeared naive.

The second reason the prosecutor stated for excusing Ms. 52 was her apparent deception about not having any contact with gangs based on her residence in South Bakersfield. As previously stated, Ms. 52 clearly stated that she lived in South Bakersfield. Several other jurors also stated that they lived in Southwest Bakersfield, however, the record does not indicate this was the same area of Bakersfield. Juror No. 210080340, stated that she lived in South Bakersfield, and also stated that she had never had contact with gang members. As the prosecutor watched the demeanor of each of the jurors in responding to the posed questions, he got the impression from Ms. 52 that she was either naive or deceptive in her answer. This may

have been very different from the demeanor of Juror No. 210080340, who may have seemed more credible in the eyes of the prosecutor. Although both jurors stated that they lived in South Bakersfield and had no contact with gang members, this does not, in itself, render the prosecutor's reasons for excluding Ms. 52 pretextual. This is so because the prosecutor's first reason was Ms. 52's age, and although No. 210080340 had the same characteristic of living in South Bakersfield and stating she had no contact with gang members, Juror No. 210080340 was undoubtedly much older, and had previous experience in serving on a criminal jury trial. (See Aug. RT 173.) Consequently, it simply cannot be said, that this juror, or any other juror, shared the same characteristics as to age and naivety so as to render the prosecutor's reason for excluding Ms. 52 pretextual. Because Juror No. 210080340 was sufficiently different from Ms. 52, the prosecutor was warranted in leaving her on the jury, and Petitioner has failed to demonstrate purposeful discrimination under step three of Batson, and the petition should be denied.[8]

D.   Abolishment of Provocative Act Murder

Petitioner contends that the state law doctrine of "provocative act" murder[9] should be abolished. Respondent argues that this claim fails to raise a federal question, because policy questions as to what state law should be are simply not allegations that a constitutional right has been violated. The Court agrees.

---

[8] Furthermore, this case does not have the same level of factual circumstances as those present in Miller-El and Kesser. In Miller-El, unlike here, there was evidence of jury shuffling and disparate questions regarding the ethnicity of the prospective jurors. Miller-El, 525 U.S. at 253-263. In addition, unlike in Kesser, the prosecutor's justifications were not tainted with racial discrimination. Kesser, 465 F.3d at 357 (the prosecutor struck three prospective Native American jurors, describing one of them as "darker skinned," stating that Native Americans who worked for the tribe were "'a little more prone to associate themselves with the culture and beliefs of the tribe than they are with the mainstream system.'"

[9] The California Supreme Court explained in People v. Slaughter, 27 Cal.4th 1187, 1202 (2002):
  The provocative act murder doctrine has traditionally been invoked in cases in which the perpetrator of the underlying crime instigates a gun battle, either by firing first or by otherwise engaging in severe, life-threatening, and usually gun-wielding conduct, and the police, or a victim of the underlying crime, responds with privileged lethal force by shooting back and killing the perpetrator's accomplice or an innocent bystander. [Citations.]

Moreover, under the provocative act murder doctrine, the perpetrator of a crime is held vicariously liable for the killing of an accomplice committed by the third party. People v. Briscoe, 92 Cal.App.4th 568, 581 (2001).

17

Generally, states have wide latitude in developing and enforcing criminal law. In <u>Schad v. Arizona</u>, 501 U.S. 624 (1991), the United States Supreme Court observed:

> That is not to say, however, that the Due Process Clause places no limits on a State's capacity to define different courses of conduct, or states of mind, as merely alternative means of committing a single offense, thereby permitting a defendant's conviction without jury agreement as to which course or state actually occurred. The axiomatic requirement of due process that a statute may not forbid conduct in terms so vague that people of common intelligence would be relegated to differing guesses about its meaning, [citations], carries the practical consequence that a defendant charged under a valid statute will be in a position to understand with some specificity the legal basis of the charge against him. Thus it is an assumption of our system of criminal justice "'so rooted in the traditions and conscience of our people as to be ranked as fundamental,'" [citations], that no person may be punished criminally save upon proof of some specific illegal conduct.

<u>Id</u>. at 632-633. Thus, for example,

> nothing in our history suggests that the Due Process Clause would permit a State to convict anyone under a charge of "Crime" so generic that any combination of jury findings of embezzlement, reckless driving, murder, burglary, tax evasion, or littering, for example, would suffice for conviction.

<u>Id</u>. at 633.

After discussing various possible analytical tests that might be employed to determine whether a statute met the requisite level of specificity, the Court held:

> We are convinced, however, of the impracticability of trying to derive any single test for the level of definitional and verdict specificity permitted by the Constitution, and we think that instead of such a test our sense of appropriate specificity is a distillate of the concept of due process with its demands for fundamental fairness, [citation] and for the rationality that is an essential component of that fairness. In translating these demands for fairness and rationality into concrete judgments about the adequacy of legislative determinations, we look both to history and wide practice as guides to fundamental values, as well as to narrower analytical methods of testing the moral and practical equivalence of the different mental states that may satisfy the mens rea element of a single offense. The inquiry is undertaken with a threshold presumption of legislative competence to determine the appropriate relationship between means and ends in defining the elements of a crime.

<u>Id</u>. at 637-638. In an effort to offer some instruction as to how to implement this broad "fundamental fairness" test, the Court noted that

> Where a State's particular way of defining a crime has a long history, or is in widespread use, it is unlikely that a defendant will be able to demonstrate that the State has shifted the burden of proof as to what is an inherent element of the offense, or has defined as to single crime multiple offenses that are inherently separate. Conversely, a freakish definition of the elements of a crime that finds no analogue in history or in the criminal law of other jurisdictions will lighten the

defendant's burden. Id. at 640.

As Respondent submits, California's provocative act murder doctrine is not a "freakish" definition so as to offend the Due Process Clause of the Fourteenth Amendment. In fact, at least one other state has implemented a judicially-developed theory of murder liability under an analysis much like that of the California courts. See Alston v. State, 339 Md. 306, 662 A.2d 247 (Md. 1995). In addition, a number of states have statutes which impose liability under circumstances akin to that of California's "provocative act" doctrine. See Criminal Liability Where Act Of Killing Is Done By One Resisting Felony Or Other Unlawful Act Committed By Defendant, Erwin S. Barbre, J.D., 56 A.L.R.3d 239, and cases cited therein.

To the extent Petitioner contends that the Eighth Amendment is applicable because he was charged and convicted of a special circumstance, Petitioner is mistaken. As Respondent correctly argues, the Eighth Amendment provides some protections to ensure that California's special circumstances adequately narrow the pool of murderers eligible for the death penalty. The instant case was never a capital case, and there is simply no requirement that the same heightened scrutiny applies to non-capital cases. Cf. Harmelin v. Michigan, 501 U.S. 957, 995 (1991) (refusing to extend requirement of individualized sentencing in capital context "'to an individualized mandatory life in prison without parole sentencing doctrine'" and finding "no comparable requirement outside the capital context"). Petitioner therefore cannot raise an Eighth Amendment challenge.

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The instant petition for writ of habeas corpus be DENIED; and
2. The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with

the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:    January 11, 2008**                        /s/ Sandra M. Snyder
                                                              UNITED STATES MAGISTRATE JUDGE